## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED ASSOCIATION OF ) | |
| JOURNEYMEN AND APPRENTICE ) | |
| PLUMBERS AND PIPEFITTERS OF THE ) | |
| UNITED STATES AND CANADA, ) | |
| LOCAL 74, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 12-1060-GMS-SRF |
| ) | |
| INTERNATIONAL BROTHERHOOD OF ) | |
| ELECTRICAL WORKERS, LOCAL 313, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

### I.     INTRODUCTION

Presently before the court in this action for breach of contract and violation of Section

302 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 186, are the following

motions: (1) plaintiff United Association of Journeymen and Apprentice Plumbers and

Pipefitters of the United States and Canada, Local 74's ("Local 74" or "plaintiff") motion for

summary judgment (D.I. 27); (2) defendant International Brotherhood of Electrical Workers,

Local 313's ("Local 313" or "defendant") cross-motion for summary judgment (D.I. 36); (3)

Local 74's motion to strike Local 313's December 4, 2013 letter to the court (D.I. 41); and (4)

Local 313's cross motion for leave to supplement the record on summary judgment (D.I. 42).

For the following reasons, I recommend that the court grant-in-part Local 74's motion for

summary judgment, deny Local 313's cross-motion for summary judgment, grant-in-part Local

74's motion to strike, and grant-in-part Local 313's cross motion for leave to supplement the

record.

## II.    BACKGROUND

Cushman and Wakefield ("C&W"), a commercial real estate and property management company, maintains and operates two commercial data centers located in Newark, Delaware ("CDC 1") and Wilmington, Delaware ("CDC 2"). (D.I. 1 at ¶¶ 7, 10; D.I. 6 at ¶¶ 7, 10)  Since CDC 1 and CDC 2 opened in 2004, C&W and its predecessors have employed approximately fifty members of unincorporated labor associations Local 74 and Local 313 as building engineers and maintenance personnel.  (D.I. 1 at ¶¶ 3, 4, 11; D.I. 6 at ¶¶ 3, 4, 11)  Two thirds of the maintenance services force is comprised of electricians from Local 313, and the remaining one third is comprised of plumbers from Local 74.  (D.I. 39, Ex. 1 at 3)

Since 2004, Local 313 has served as the exclusive bargaining representative for a single bargaining unit comprised of the employees from Local 74 and Local 313 at CDC 1 and CDC 2. (D.I. 37, Ex. C at 23:11 – 24:15)  In 2004, Local 313 entered into a collective bargaining agreement with EMCOR, Inc., the maintenance subcontractor.  (D.I. 37, Ex. C at 24:16 – 26:11) EMCOR was replaced by PM Realty in 2006, and PM Realty continued to recognize Local 313 as the exclusive bargaining representative under the terms of the collective bargaining agreement between EMCOR and Local 313.

When the 2004 collective bargaining agreement expired, Local 313 and PM Realty entered into a new collective bargaining agreement covering the period from December 2008 through November 2011 (the "CBA").  (D.I. 1 at ¶ 12; D.I. 6 at ¶ 12; D.I. 29, Ex. B)  Although Local 74 was not a signatory to the CBA, the CBA contained a clause recognizing the employment of members of Local 74 and incorporating the wage, benefit, and dues scales of Local 74 into the CBA.[1]  (D.I. 1 at ¶ 13; D.I. 6 at ¶ 13; D.I. 29, Ex. B)  Pursuant to the terms of

---

[1] Specifically, the union security clause at § 7(1) of the CBA provides that:

the CBA, C&W deducted a working dues percentage[2] from the paychecks of employees from

both Local 313 and Local 74 on a monthly basis and forwarded the deducted amounts to Local

313. (D.I. 1 at ¶ 18; D.I. 6 at ¶ 18; D.I. 31, Ex. D at 46:7 – 47:24) The employees of Local 74

each signed a written authorization card permitting C&W to deduct dues and fees from their pay

"in satisfaction of working dues," and requiring that those deductions be remitted to Local 74.

(D.I. 1 at ¶ 25; D.I. 33, Ex. F at ¶¶ 3-4)

Until June 2011, Local 313 retained the amounts due for its own members and forwarded

the amounts due for Local 74 members to the GEM Group, the administrator of the Local 74

benefit funds. (D.I. 1 at ¶¶ 20-21; D.I. 6 at ¶¶ 20-21; D.I. 31, Ex. D at 49:21 – 50:3) Beginning

---

All present bargaining unit employees who are members of the Union on the
effective date of this agreement or on the date of execution of this agreement,
whichever is the later, shall remain members of the Union in good standing as a
condition of employment. All bargaining unit employees who are not members of
the Union and all such employees who are hired hereafter shall become and
remain members in good standing of the Union as a condition of employment . . .
For the purpose of this provision, membership in good standing in Plumbers &
Pipefitters Local Union 74, which shall also provide employees under this
agreement, shall be considered as compliance with this provision.

(D.I. 29, Ex. B at 2) Moreover, § 10(a) and (b) of the CBA, entitled "Wages and Trust Funds,"
lists the procedural requirements for paying employees:

(a) The Company hereby agrees to checkoff from wages of any employee
employed by the Company under the agreement dues and/or assessments in the
amount specified in the Union's Bylaws. (For the purpose of this provision, the
Bylaws of Plumbers & Pipefitters Local 74 shall apply with respect to any of its
members employed under this agreement) and to remit said amount to the Union.
. .
(b) The obligations of the Company under this provision shall apply only to those
employees who have voluntarily signed a valid authorization card.

(D.I. 29, Ex. B at 5)

[2] Local 74 assesses its members a working dues percentage of 5.25% of their gross hourly wage.
(D.I. 1 at ¶ 16; D.I. 6 at ¶ 16; D.I. 29, Ex. B at Ex. A) Local 313 assessed its members a working
dues percentage of 3.8% of their gross hourly wage until September or October of 2012, when
the rate increased to 5%. (D.I. 1 at ¶ 17; D.I. 6 at ¶ 17; D.I. 29, Ex. B at Ex. A; D.I. 31, Ex. D at
47:10-11; D.I. 32, Ex. D at 86:8-10)

3

in June 2011, Local 313 business manager Douglas Drummond instituted a new practice, based on his interpretation of the agency shop clause found at § 10(e) of the CBA,[3] in which Local 313 kept a portion of Local 74 dues equal to the amount of its own dues instead of forwarding the entire amount withheld to Local 74. (D.I. 1 at ¶ 22; D.I. 31, Ex. D at 50:8 – 54:1; Ex. E) As a result, Local 74 began receiving the difference between 5.25% and 3.8%, as opposed to the full 5.25%. (D.I. 1 at ¶ 24; D.I. 6 at ¶ 24) As of July 11, 2013, the amount of dues retained by Local 313 from the wages of members of Local 74 totaled $106,180.06. (D.I. 33, Ex. F at ¶ 8 and Ex. 3)

During the term of the CBA, PM Realty was replaced as the maintenance contractor by C&W, which continued the terms of PM Realty's CBA until a new agreement could be negotiated. (D.I. 37, Ex. C at 26:10 – 27:17) Negotiations on a new collective bargaining agreement between C&W and Local 313 began in October 2011, and Local 74 again did not participate in the negotiations. (D.I. 37, Ex. C at 38:17-22) Local 313 and C&W reached agreement on all terms except the language of the union security clause, found at § 7. (D.I. 37, Ex. B at 3) The disputed language reads as follows:

> All present bargaining unit employees who are members of the Union on the effective date of this agreement or on the date of execution of this agreement, whichever is the latter, shall remain members of the Union in good standing as a condition of employment. **All bargaining unit employees who are not**

---

[3] Section 10(e) of the CBA provides as follows:

> (e) Agency Shop Clause. All employees covered by this agreement shall as a condition of continued employment, pay to the employee's exclusive collective bargaining representative an amount of money equal to that paid by other employees in the bargaining unit who are members of the Union, which shall be limited to an amount of money equal to the Union's regular and usual initiation or administration processing fees, and its regular and usual dates and assessments.

(D.I. 29, Ex. B at 6)

4

**members of the Union and all such employees who are hired hereafter shall become and remain members in good standing of the Union as a condition of employment** on and after the 31st day following the beginning of their employment, or on and after the 31st day following the effective date of this agreement or the date of execution of this agreement, whichever is the latter. **For purposes of this provision, membership in good standing in the Plumbers and Pipefitters Local Union 74 shall be considered as compliance with this provision.**

(D.I. 37, Ex. A at § 7(1); *see also* D.I. 29, Ex. B at § 7(1)) (emphasis added). Specifically, Local 313 sought to remove the language indicating that membership in Local 74 is equivalent to membership in Local 313. (D.I. 37, Ex. B at 4) C&W insisted that the language be retained, and the parties reached an impasse on the issue. (*Id.*)

Local 313 filed unfair labor practice charges with the National Labor Relations Board ("NLRB") in response to C&W's refusal to enter into a collective bargaining agreement with Local 313 that would include terms compelling Local 74 to pay dues to Local 313 as a condition of employment. (D.I. 37, Ex. B) Local 313 prevailed against C&W before the NLRB, which concluded that the dispute did not involve a mandatory subject for bargaining upon which the employer could insist to impasse. (*Id.* at 6) ("[C&W's] insistence that [Local 74's] membership be considered membership for the purposes of the union security clause flies in the face of the statutory scheme that permits union security clauses in the first place.").[4]

---

[4] Prior to the issuance of the NLRB's decision, the parties entered into an agreement providing that the disputed language would be stricken from the union security clause if the three-member panel of the NLRB determined that C&W was not justified in its insistence that the specific reference to Local 74 be retained. (D.I. 32, Ex. D at 94:6-12) If, however, the NLRB ruled in favor of Local 74, the language would be retained. (*Id.*) Following the NLRB's ruling in favor of Local 313, the disputed language was stricken from the existing CBA. This Report and Recommendation addresses the rights and obligations of the parties under the language of the collective bargaining agreements prior to any modifications arising from the NLRB's decision issued on November 19, 2013.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those that could affect the outcome of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey,* 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 248 (1986)). Pursuant to Rule 56(c)(1), a party asserting that a fact is genuinely disputed must support its contention either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B).

The moving party bears the initial burden of proving the absence of a genuinely disputed material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317 (1986). The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986); *Williams v. Borough of West Chester, Pa.,* 891 F.2d 458, 460–61 (3d Cir.1989). When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *See Scott v. Harris,* 550 U.S. 372, 380 (2007); *Wishkin v. Potter,* 476 F.3d 180, 184 (3d Cir. 2007). However, the existence of some evidence in support of the nonmoving party may not be sufficient to deny a motion for summary

6

judgment. Rather, there must be enough evidence to enable a jury reasonably to find for the nonmoving party on the issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). If the nonmoving party fails to make a sufficient showing on an essential element of its case on which it bears the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. at 322.

## IV. DISCUSSION

The enforcement and interpretation of collective bargaining agreements under § 301 of the LMRA, 29 U.S.C. § 185, is governed by substantive federal law. *Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 456 (1957). However, traditional rules for contractual interpretation apply to the extent that their application is consistent with federal labor policies. *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). In keeping with these principles, the court must first inquire whether the contract in question is ambiguous. *Stendaro v. Fed. Nat'l Mortgage Ass'n,* 991 F.2d 1089, 1094 (3d Cir. 1993). The existence or absence of ambiguity is a "threshold" question of law for the court to decide. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars Inc.*, 989 F.2d 132, 135 (3d Cir. 1966).

### A. Terms of the CBA

It is assumed that "the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994). A contract provision is ambiguous if it is susceptible to two reasonable alternative interpretations. *Mellon Bank, N.A. v. Aetna Bus. Credit, Inc.*, 619 F.2d 1001, 1011

7

(3d Cir. 1980). Each provision in question must be viewed consistently with the entire document and the relative positions and purposes of the parties. *Kellogg Co. v. N.L.R.B.*, 457 F.2d 519, 524 (6th Cir. 1972). "In these circumstances, the court may consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Sheet Metal Workers, Local 19*, 949 F.2d at 1284. In keeping with basic contract principles, a collective bargaining agreement's terms should be given a reasonable construction, and "must be construed so as to render none nugatory and avoid illusory promises." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983); *Kellogg Co.*, 457 F.2d at 525.

In support of its motion for summary judgment, Local 74 alleges that Local 313 breached the terms of the CBA by withholding working dues checkoffs from Local 74. Local 74 contends that the CBA calls for Local 74 to receive the "dues and/or assessments" deducted from the paychecks of its members, consistent with the parties' interpretation of the contract language from 2004 to June 2011.[5] (D.I. 28 at 9-11) According to Local 74, if the agency shop clause provision were given the construction proposed by Local 313, the CBA's reference to Local 74 and its bylaws in § 10(a) would be superfluous. (*Id.*) Moreover, Local 74 argues that the union security clause at § 7 of the CBA requires its members to pay their dues and fees to remain in good standing, and it is illogical to suggest that Local 74 members are required to pay both Local 74 working dues and Local 313 working dues in full. (*Id.* at 12)

---

[5] Local 74 contends that the parties' course of conduct under the CBA from 2004 to June 2011 supports its interpretation of the CBA because during that time, C&W and its predecessors transmitted all dues deducted from employee paychecks to Local 313, and Local 313 then forwarded the total amount deducted from Local 74 members to Local 74. (*Id.* at 13) Former business manager Steven Horgan initiated this practice in 2004 and 2005, and business manager Donald Drummond continued this same course of conduct from 2005 to June 2011. (*Id.* at 13-14) According to Local 74, the consistent course of conduct may be viewed as evidence of an oral contract between Local 313 and Local 74. (*Id.* at 16)

8

In response, Local 313 alleges that it did not breach the plain, unambiguous language of the CBA by retaining a portion of the dues checkoffs of Local 74 members because the CBA clearly states that union dues must be remitted and paid to Local 313 pursuant to the agency shop clause. (D.I. 37 at 9-10) Local 313 further contends that construing the language of the agency shop clause in the manner proposed by Local 74 would contradict § 8(a)(3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(3), which protects collective bargaining representatives from employees who enjoy the benefits of association with the union without contributing financially. (*Id.* at 12) Under the parol evidence rule, Local 313 asserts that Local 74 cannot rely on any alleged oral agreement to supersede or modify the unambiguous terms of the CBA, and any oral agreement would be invalid to the extent that it contradicts the express terms of the CBA. (*Id.* at 13) Even if a prior course of conduct created implied obligations, Local 313 asserts that those did not survive the expiration of the CBA in 2011. (*Id.* at 15)

The court must determine the existence or absence of ambiguity in a collective bargaining agreement. *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Mack Trucks, Inc.*, 917 F.2d 107, 111 (3d Cir. 1990); *Teamsters Indus. Employees Welfare Fund v. Rolls-Royce Motor Cars Inc.*, 989 F.2d 132, 135 (3d Cir. 1966). It is assumed that "the intent of the parties to an instrument is embodied in the writing itself, and when the words are clear and unambiguous the intent is to be discovered only from the express language of the agreement." *Hullett v. Towers, Perrin, Forster & Crosby, Inc.*, 38 F.3d 107, 111 (3d Cir. 1994). "[T]he collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983).

In the present case, the language of the CBA is ambiguous as to whether Local 74 owes any dues to Local 313. Although § 1 of the CBA defines references to the "Union" in the agreement as pertaining to Local 313 (D.I. 29, Ex. B at 1), § 7(1) of the CBA provides that membership in good standing in Local 74 qualifies as membership in the "Union" as well. This provision does not set forth additional requirements for members of Local 74 beyond what is required to remain in good standing in their own union. Section 7(3)(b) of the CBA provides that the wages, hours, and terms and conditions of employment of all employees, whether from Local 74 or Local 313, shall be governed by the terms of the CBA. (D.I. 29, Ex. B at 3)

Consistent with the language of § 7, § 10(a) of the CBA indicates that the assessment of dues is governed by each union's respective bylaws, but provides that such dues shall be remitted to the "Union." (D.I. 29, Ex. B at 5) The Local 74 bylaws require that its members pay dues at a rate of 5.25% to Local 74 to remain in good standing. (D.I. 1 at ¶ 16; D.I. 6 at ¶ 16; D.I. 29, Ex. B at Ex. A) However, the agency shop clause contained in § 10(e) of the CBA indicates that all employees are required to pay dues to Local 313 as the exclusive collective bargaining representative in an amount equal to members of Local 313.

Whereas §§ 7(1) and 10(a) of the CBA suggest that members of Local 74 need only remit dues to their own union, § 10(e) could be construed to require all employees, regardless of whether they are associated with Local 74 or Local 313, to remit dues to Local 313 as compensation for its role as the exclusive collective bargaining representative. Therefore, the terms of the CBA are ambiguous, and the court must next construe the terms of the CBA in accordance with general principles of contract interpretation.

"Collective bargaining agreements, like other contracts, are to be given a reasonable construction, not one which results in injustice and absurdity." *Kellogg Co. v. NLRB*, 457 F.2d

519, 525 (6th Cir. 1972). In construing the ambiguous terms of a collective bargaining agreement, "the Court may consider the words of the contract, the alternative meaning suggested by counsel, and the nature of the objective evidence to be offered in support of that meaning." *Sheet Metal Workers, Local 19 v. 2300 Group, Inc.*, 949 F.2d 1274, 1284 (3d Cir. 1991). It is a "cardinal rule" of contractual interpretation that words or provisions should not be rendered meaningless. *Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012).

The language in § 10(a) of the CBA instructs C&W to "remit said amount [of dues and/or assessments] to the Union," but this language does not automatically permit Local 313 to retain dues from members of Local 74 for its own purposes. To construe the provision in this manner would violate the "cardinal rule" of contractual interpretation by negating the parenthetical language of the very same subsection, which provides that, "[f]or the purpose of this provision, the Bylaws of Plumbers & Pipefitters Local 74 shall apply with respect to any of its members employed under this agreement." *See Pac. Employers Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 430 (3d Cir. 2012). The bylaws of Local 74 require its members to pay 5.25 % of their wages as working dues to Local 74, with no provision for sharing those dues with other unions.

To the extent that Local 313 claims that it is the "Union" to which the dues must be remitted, this argument ignores the language of § 7(1) of the CBA. Section 7(1) requires employees to "become and remain members in good standing of the Union as a condition of employment," with "Union" being defined at § 1 of the CBA as referring to Local 313. However, § 7(1) goes on to state that "membership in good standing in Plumbers and Pipefitters Local Union 74 . . . shall be considered as compliance [sic] with this provision." (D.I. 29, Ex. B

11

at § 7) This carve-out indicates that members of Local 74 are considered "members in good standing of the Union" simply by being members of Local 74, with no additional requirement that they join Local 313 as well. Any other interpretation would render the specific mention of Local 74 in this provision meaningless.

Local 313 relies on the Agency Shop Clause at § 10(e) in support of its proposed interpretation of the CBA, alleging that § 10(e) plainly requires all employees covered by the CBA to pay dues to Local 313 as their exclusive collective bargaining representative. (D.I. 37 at 10-12) However, this interpretation would render the CBA's specific references to Local 74 in §§ 7(1) and 10(a) superfluous, in contravention of the "cardinal rule" of contract interpretation against rendering a contractual provision "mere surplusage." *See Pac. Employers Ins.*, 693 F.3d at 430; *JFE Steel Corp. v. ICI Ams., Inc.*, 797 F. Supp. 2d 452, 469 (D. Del. 2011). In contrast, the Agency Shop Clause at § 10(e) is not rendered meaningless by the court's proffered construction because the provision continues to apply to any other employees covered by the terms of the CBA who are not subject to the carve-outs for members of Local 74 found at §§ 7 and 10. Therefore, the language of the CBA, viewed as a whole, does not strongly support Local 313's proposed interpretation.

The court is not persuaded by Local 313's contention that the dues apportionment it advocates is the only reasonable interpretation of the CBA. Local 313's contention that its construction would never result in a double payment of dues by a member of Local 74 is belied by a hypothetical in which Local 313's dues assessment exceeds the amount of dues assessed by Local 74. If Local 313's interpretation of the CBA were accepted in view of this hypothetical, an employee member of Local 74 could conceivably be obligated to remit dues in the same amount as a member of Local 313 while maintaining "good standing" in Local 74 by payment of

12

Local 74's dues assessment as well. Such a double payment cannot reasonably reflect the intent underlying the terms of the CBA.

## B.     Written Authorization to Deduct Dues

The extrinsic evidence further supports Local 74's proposed construction of the CBA. Local 74 alleges that, because none of the affected employees signed a written authorization card permitting Local 313 to seize a portion of his or her pay, Local 313 is lawfully prohibited from deducting such dues from Local 74 members' wages pursuant to § 302 of the LMRA, 29 U.S.C. § 186. (D.I. 28 at 17) Local 74 challenges Local 313's reliance on the Supreme Court's decision in *Arroyo v. United States*, 359 U.S. 419, 421 (1959), because *Arroyo* addressed whether an official who misappropriated money that had been properly deducted and delivered to a trust fund could be criminally punished under that section, and has been distinguished by the Supreme Court on that basis.[6] (D.I. 38 at 9-10)

In response, Local 313 alleges that the money deducted from the paychecks was "in payment of membership dues in a labor organization," and members of Local 74 authorized C&W in writing to make the deductions. Local 313 contends that no additional explicit authorization was required because once C&W forwarded the lawfully deducted dues to Local 313, the proper distribution of the dues was governed by the terms of the CBA. (D.I. 37 at 17) Accordingly, Local 313 contends that the dues deductions sent to Local 313 were lawfully made, and whether Local 313 was permitted to retain a portion of the dues is a separate contractual issue outside the scope of § 302. (*Id.* at 16-17)

Section 302(a) of the LMRA provides that "[i]t shall be unlawful for any employer . . . to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value – (1) to

---

[6] *See Local 144 Nursing Home Pension Fund v. Demisay*, 508 U.S. 581, 591 (1993) (noting that the proposition cited in *Arroyo* "was a criminal prosecution brought under § 302(d), and the statement was therefore pure dictum.").

13

any representative of any of his employees . . . ; or (2) to any labor organization . . ." 29 U.S.C. § 186(a). Section 302(c)(4) contains an exception to this provision "with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided*, That the employer has received from each employee, on whose account such deductions are made, a written assignment . . ." 29 U.S.C. § 186(c)(4). Moreover, § 10(b) of the CBA provides that "[t]he obligations of the Company under this provision shall apply only to those employees who have voluntarily signed a valid dues deduction authorization card," and § 10(c) identifies the form of deduction authorization card to be used and specifies that the form is "to be supplied . . . by the Union." (D.I. 29, Ex. B at § 10)

The parties agree that the money deducted from the employees' paychecks by the employer was "in payment of membership dues in a labor organization" pursuant to § 302(a). (D.I. 1 at ¶ 18) Moreover, it is undisputed that members of Local 74 authorized C&W in writing to make deductions for union dues from their paychecks. (D.I. 1 at ¶ 25; D.I. 33, Exs. F1 & F2) However, the members of Local 74 did not explicitly authorize Local 313 to retain a portion of their wages. Pursuant to their signed authorization cards, members of Local 74 agreed to assign "all dues and assessments which I am required to pay to U.A. Local 74 for each hour I work. I authorize and direct you to deduct such amount from my pay . . . and to remit same to Local Union No. 74 at such times and in such manner as may be agreed upon between you and Local Union No. 74 at any time while this authorization is in effect."[7] (D.I. 33, Ex. F1) The language of the authorization cards contemplates that the employer will deduct dues from the wages of

---

[7] The record also contains "Payment Election Forms," in which members of Local 74 "elect to have Cushman & Wakefield National, [the] Employer, make payroll deductions for the above in the amount designated by the Plumbers and Pipefitters, Local Union 74." (D.I. 34, Ex. F2) Although these forms do not contain the same express language as the dues authorization cards, they demonstrate a consistent practice of ensuring that payments are deducted for the benefit of Local 74.

14

Local 74 members, but unequivocally states that the dues must ultimately be remitted to Local 74. (*Id.*) In contrast, the authorization cards did not provide similar authorization for dues deductions on behalf of Local 313. (D.I. 33, Ex. F1) In fact, the members of Local 74 and Local 313 signed separate forms authorizing wage deductions to be paid to their respective unions. (*Id.* at Ex. F2)

Although members of Local 74 signed cards authorizing Local 313 to act as their exclusive collective bargaining representative, nothing in those cards authorized Local 313 to deduct dues from the wages of members of Local 74 on behalf of Local 313. (D.I. 34, Ex. G) In view of the language contained in the authorization cards, Local 313's proposed construction of the CBA is implausible because it would result in a violation of both Local 74's bylaws, which provide that members must pay 5.25% of their wages to Local 74 as working dues to remain in good standing, and the CBA, which requires members of Local 74 to remain in good standing in their own union as a condition of compliance with the CBA. (D.I. 30, Ex. C at 34:4-18; D.I. 29, Ex. B at § 7(1)); *See NLRB v. General Motors Corp.*, 373 U.S. 734, 742 (1963) ("'Membership' as a condition of employment is whittled down to its financial core.").

## C. The Parties' Course of Conduct

The parties' pattern of conduct further supports Local 74's interpretation of the CBA. "Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Old Colony Trust Co. v. Omaha*, 230 U.S. 100, 118 (1913) (internal citations omitted); *see also New Jersey v. Delaware*, 552 U.S. 597, 618-19 (2008) ("We turn, finally, to the parties' prior course of conduct . . .which . . ., like the course of conduct of parties to any contract, is evidence of its meaning."); Restatement (Second) of Contracts § 223 ("Unless

15

otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement."). These general principles of contract interpretation also apply to collective bargaining agreements. *See Teamsters Industrial Employees Welfare Fund v. Rolls-Royce Motor Cars, Inc.*, 989 F.2d 132, 137 (3d Cir. 1993).

The parties do not dispute that from 2004 to June 2011, Local 313 received the dues from the employer on behalf of Local 74 and distributed those dues in full to Local 74 without taking a portion of those dues for itself. (D.I. 30, Ex. C at 32:14-19) The parties also agree that Drummond's decision to retain a percentage of the Local 74 dues for Local 313 beginning in June 2011 was a departure from the parties' previous pattern of conduct.[8] (D.I. 31, Ex. D at 46:7

---

[8] In the Confidential Witness Affidavit of Douglas Drummond from the NLRB proceedings, dated August 2, 2012, Drummond indicated that

[i]n the last 12 months, Local 313 has charged Local 74's members 5.25% and has been retaining 3.8% of those dues for Local 313 and has been remitting the remainder (which is 1.45%) to Local 74. The CBA has always required that 5.25% for dues-checkoff for Local 74 members and 3.8% for Local 313 members . . . There's no written agreement governing how much of the dues assessments should be remitted or how the dues should be split between the members' "home local" and the working local. Prior to about a year ago, Local 313 remitted 100% of the 5.25% dues assessment of Local 74 members' wages to Local 74. Currently, it's our understanding the [sic] Local 74 is planning to file a Section 301 action concerning Local 313 keeping a portion of the Local 74 members' dues assessments.

(D.I. 33, Ex. E at APP231) Drummond's deposition testimony further confirms that a change in the parties' previous course of conduct occurred in June 2011:

Q. So there was a point where you decided to start keeping a portion?
A. Yes.
Q. Okay. Prior to that, you had sent the full 5.25 percent, or whatever the earlier percentage had been?
A. To the best of my knowledge, I believe we did.

(D.I. 31, Ex. D at 49:21 – 50:3)

16

– 50:3) The parties' previous course of conduct, in which dues were remitted in full to Local 74, and Local 313 did not retain any portion of those dues, therefore supports Local 74's proposed construction of the CBA.

Local 313's contentions that the parties' course of conduct may not be considered are unfounded in the present case because the parties' previous pattern of conduct does not depart from or alter the terms of the CBA. (D.I. 30, Ex. C at 38:2 – 40:7); *see also Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 726 F. Supp. 2d 459, 463 (D. Del. 2010). In fact, the CBA contemplates a separate understanding between members of Local 74 and Local 313 at § 7(3), which provides that, "in some instances where certain special qualifications are required, the Union shall, though a separate understanding by and between it and Plumbers & Pipefitters Local Union 74, refer applicants from Local 74 to fill such positions." (D.I. 29, Ex. A at § 7(3)(a)) Local 313 concedes that an oral agreement is only invalid to the extent that it contradicts the express terms of the CBA. (D.I. 37 at 13-14) For these reasons, the parties' previous course of conduct properly informs the court's construction of the CBA, regardless of whether a written or oral agreement governing the distribution of wage deductions existed between the parties.[9]

---

Q. Okay. So between 2004 and 2011 of living under a Collective Bargaining Agreement at CDC 1 and CDC 2, you deducted the full percentage, or you sent the full percentage deducted from Local 74 members to Local 74?
A. The process was started in 2004, before me.
Q. Right.
A. When I got in office, I began to question why we were doing it. Until I got a concrete answer, we continued the practice mistakenly.

(D.I. 31, Ex. D at 53:17 – 54:1)

[9] In response to Local 74's argument that an oral or written agreement existed, Local 313 alleges that Local 74's proposed construction is flawed because Local 313 received no consideration under the CBA. (D.I. 37 at 14-15) However, the record reflects that EMCOR wanted to deal with only Local 313, but association with Local 74 was necessary because members of Local 313

17

Citing the Supreme Court's decision in *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 207 (1991), Local 313 alleges that any implied obligations created by the parties' previous course of conduct terminated with the expiration of the CBA in 2011. (D.I. 37 at 15) As a preliminary matter, the court notes that the portion of *Litton* cited by Local 313 did not address implied obligations arising under a collective bargaining agreement, nor did it address the parties' course of conduct in the context of construing the contractual language. Instead, the case addresses the effect of the express contractual terms after expiration of the agreement, and stands for the proposition that "an expired contract has by its own terms released all its parties from their respective contractual obligations." *Id.* at 206.

The Third Circuit has held that "when a contract lapses but the parties to the contract continue to act as if they are performing under a contract, the material terms of the prior contract will survive intact unless either one of the parties clearly and manifestly indicates, through words or through conduct, that it no longer wishes to continue to be bound thereby." *Luden's Inc. v. Local Union No. 6 of Bakery, Confectionery, & Tobacco Workers' Int'l Union of Am.*, 28 F.3d 347, 355-56 (3d Cir. 1994). Local 313 changed its course of conduct in June 2011, several months prior to the expiration of the CBA, and subsequent negotiations for a new collective bargaining agreement failed when the parties reached an impasse regarding whether to modify the language specifically referencing Local 74. (D.I. 37, Ex. B). The parties expressly agreed that the disputed language would remain in the 2011-2014 agreement unless and until the NLRB ruled in favor of Local 313 and ordered the language stricken from the 2011-2014 agreement. (D.I. 32, Ex. D at 94:1-12) In light of the parties' agreement to maintain the status quo until the

---

were not certified to address the plumbing needs of the location. (D.I. 30, Ex. C at 9:12-10:20) Association with Local 74 enabled Local 313 to meet the employer's requirements, and was beneficial to Local 313 in that regard. (*Id.* at 20:9-18)

18

NLRB resolved the dispute, Local 313 has failed to demonstrate a clear indication that the parties no longer wished to be bound by the CBA prior to the issuance of the NLRB's decision.

## D. Motion to Strike and Motion for Leave to Supplement the Record

Having construed the language of the CBA, the court next addresses Local 74's motion to strike and Local 313's motion for leave to supplement the record, which are relevant to the scope of the court's ruling on summary judgment. (D.I. 41; D.I. 42) By way of its motion to strike, Local 74 asks the court to strike Local 313's December 4, 2013 letter, as well as the attached revised 2011-2014 collective bargaining agreement and a July 19, 2012 email from C&W's counsel to Local 313's counsel. (D.I. 41 at ¶ 3) In response, Local 313 alleges that the modified 2011-2014 collective bargaining agreement is linked to the NLRB's November 19, 2013 decision, and the July 19, 2012 email was not produced in discovery due to the excusable neglect of its counsel. (D.I. 42 at 2-3)

Pursuant to the discretion offered by Local Rule 7.1.2(a),[10] I recommend that the court deny Local 74's motion to strike and grant Local 313's cross-motion to supplement the record as they pertain to the modified 2011-2014 collective bargaining agreement, and grant the motion to strike but deny the cross-motion to supplement the record as they pertain to the related correspondence. Consideration of the modified 2011-2014 agreement is appropriate because Local 74 set no clear boundaries on the time frame for which it seeks damages. (D.I. 1 at ¶ 22) ("Since June 2011 and continuing through the present . . . Drummond has directed Local 313 to begin keeping a portion of the Local 74 working dues assessment . . ."). Local 74 requests in its opening summary judgment brief a "judgment reflecting the amount seized by IBEW 313 to

---

[10] Local Rule 7.1.2(a) provides that, "[e]xcept for the citation of subsequent authorities, no additional papers shall be filed absent Court approval." The modified 2011-2014 collective bargaining agreement and correspondence proffered by Local 313 are not subsequent authority and, therefore, are admissible only to the extent permitted by the court.

19

date," and its motion to strike provides no greater clarity, stating only that "[t]he motions before the Court concern monies seized by the defendant *prior to* the implementation of [the modified 2011-2014 collective bargaining agreement]." (D.I. 28 at 19; D.I. 41 at ¶ 4) (emphasis in original) Because of the open-ended nature of Local 74's request for relief, and the fact that genuine issues of material fact exist regarding the modifications to the 2011-2014 collective bargaining agreement following the NLRB's decision,[11] the court can only construe the terms of the CBA and the undisputed facts surrounding that agreement as a matter of law. The factual disputes pertaining to the modified 2011-2014 collective bargaining agreement are therefore more appropriately reserved for the jury to resolve. In light of the foregoing, I recommend that the court adopt Local 74's proposed construction of the CBA for the reasons previously discussed,[12] but deny summary judgment to the extent that it applies to the modified 2011-2014 collective bargaining agreement.

I recommend that the court grant Local 74's motion to strike and deny Local 313's cross-motion to supplement the record as they pertain to the correspondence dated December 4, 2013 and July 19, 2012. Local 313 concedes that the July 19, 2012 email was previously available to it and should have been produced during discovery, "but for excusable neglect on the part of Defendant's counsel." (D.I. 42 at 3) However, Local 313 fails to show good cause in support of

---

[11] Specifically, the parties appear to dispute the correct version and/or date of applicability of the modified 2011-2014 collective bargaining agreement, (D.I. 41 at ¶ 3) (". . . the alleged contract appears to be a version that differs from the document produced by the defendant."), as well as whether the modified 2011-2014 agreement conflicts with evidence that Local 74 employees currently working under the CBA were grandfathered in, (D.I. 32, Ex. D at 92:5-22; 94:6-24; D.I. 37, Ex. C at 47:10-20; D.I. 40, Ex. A)

[12] Contrary to Local 313's contentions, the modifications made to the 2011-2014 collective bargaining agreement reinforce the court's construction of the CBA. If the language unambiguously conveyed a construction consistent with Local 313's interpretation, the removal of language specifically referring to Local 74 would not have been necessary.

20

its excusable neglect argument, instead indicating that the omission was the result of "oversight," and the court therefore has no basis to permit the July 19, 2012 email's inclusion on the record. *See Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 392 (1993) (observing that "inadvertence, ignorance of the rules, or mistakes construing the rules do not usually constitute 'excusable' neglect"). Local 313 will not suffer prejudice as a result of the email's exclusion because, in its own words, "the existence, origin and purpose of the July 19, 2012 email is already part of the summary judgment record." (D.I. 42 at 3, 8) I recommend that the court also strike Local 313's December 4, 2013 letter to this court due to its discussion of the July 19, 2012 email.

## E.    Exhaustion of Dispute Resolution Mechanisms

Local 313 alleges that Local 74's suit must be dismissed because Local 74 failed to first exhaust the available dispute resolution mechanisms. (D.I. 37 at 18) Local 313 points out that both Local 74 and Local 313 are members of the Building and Construction Trades, AFL-CIO, and the AFL-CIO Constitution provides mandatory mechanisms for dispute resolution. (*Id.*) In response, Local 74 alleges that the cases cited by Local 313 in support of its argument relate to the preemptive authority of the NLRB or an employee's failure to take advantage of the grievance procedure contained in the CBA, but do not require the exhaustion of all available mechanisms for dispute resolution. (D.I. 38 at 11) Moreover, Local 74 alleges that nothing in the contracts between Local 74 and Local 313 requires the parties to arbitrate, and the provision of the AFL-CIO Constitution cited by Local 313 does not apply because the parties do not claim the right to do work traditionally done by the other trade. (*Id.*)

The portions of the AFL-CIO Constitution cited by Local 313 do not support Local 313's position that Local 74 was required to pursue alternative dispute resolution mechanisms before

21

bringing suit in this court. Although sections 7 and 9 of the AFL-CIO Constitution outline a procedure for mediating disputes among affiliates and subsequently holding a "full and fair hearing before an Impartial Umpire" if the dispute is not resolved through mediation, nothing in these provisions prohibits affiliated unions from seeking relief through the courts. (D.I. 6, Ex. 1 at Art. 20, §§ 7, 9)

Moreover, the case law cited by Local 313 is inapposite because the decisions turned on the fact that collective bargaining agreements contained exclusive grievance and arbitration procedures not present in the CBA currently at issue. Specifically, the Third Circuit's decision in *Wheeler v. Graco Trucking Corp.* is inapplicable to the facts of the present case because the collective bargaining agreement in *Wheeler* set forth "exclusive grievance and arbitration procedures" not present in the CBA at issue in the instant matter. 985 F.2d 108, 112 (3d Cir. 1993); *see also Clayton v. Int'l Union, UWA*, 451 U.S. 679, 687 (1981) ("However, we decline to impose a universal exhaustion requirement lest employees with meritorious § 301 claims be forced to exhaust themselves and their resources by submitting their claims to potentially lengthy internal union procedures that may not be adequate to redress their underlying grievances."); *Wallker v. Chrysler Corp.*, 601 F. Supp. 1358, 1361 (D. Del. 1985). For these reasons, Local 74's alleged failure to exhaust the available dispute resolution mechanisms does not bar it from pursuing the instant action in this court.

## IV. CONCLUSION

For the foregoing reasons, I recommend that the court: (1) grant-in-part Local 74's motion for summary judgment (D.I. 27); (2) deny Local 313's motion for summary judgment (D.I. 36); (3) grant-in-part Local 74's motion to strike (D.I. 41); and (4) grant-in-part Local 313's cross-motion for leave to supplement the summary judgment record (D.I. 42). Partial summary

judgment is warranted because material issues of fact remain as to the damages period and the amount of damages to which Local 74 is entitled. The parties do not dispute that the relevant damages period commenced in June 2011, when the practice of remitting the full amount of dues to Local 74 ceased. However, material issues of fact exist with regard to whether the modification of the CBA in light of the NLRB decision terminated Local 74's entitlement to all or a portion of the membership dues, and if so, when the modification took effect.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court. *See Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987); *Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006).

The parties are directed to the Court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available at http://www.ded.uscourts.gov/court-info/local-rules-and-orders/general-orders.

Dated: January 27, 2015

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE